Thank you, Your Honor, and may it please the Court, I am Matthew Higgins, representing GATS Transmission NW in its narrow challenge to FERC's treatment of replacement compressor  This appeal flows from FERC's 2023 Certificate Order for a Pipeline Expansion Project, but GTN's challenge centers on FERC's treatment of three replacement compressor units placed into service in 2021, two years before the Certificate Order. Those facilities ensured continued reliable service for the pipeline's existing shippers and replaced compressors that had been in service for three years past their useful lives. The cost of those replacement facilities should have presumptively been rolled into GTN's general system rate, meaning that existing shippers and any future expansion shippers that use those facilities would pay the same rate for doing so. That makes sense because under FERC's foundational cost causation principles, existing and expansion shippers should both pay for facilities that they both use. But instead, here, FERC ruled that the expansion shippers and only the expansion shippers might be exclusively responsible for a portion of the replacement costs, even though those replacement compressor units benefited all shippers. That ruling was unreasonable under two separate lines of FERC precedent. First, when a replacement project is authorized under Section 2.55b, the costs of that replacement project are presumptively rolled into the existing system rates, and that presumption carries through until the next rate-making proceeding. FERC applied that rule in A&R under very similar facts. In A&R, in the same proceeding, a replacement compression facility was authorized under Section 2.55b with software controls in place, and FERC certificated an expansion. Do you want to cite your best case that says that FERC has to do that? The best case would be A&R in 2020, and the cases that, the core cases that say FERC needs to follow that precedent are United, or excuse me, University of Texas, Anderson Cancer, and FCC versus Fox Television Stations. The Supreme Court case that says an agency must display awareness that it is changing positions. In this case, FERC did change positions from the position that it took in 2020 in A&R. As I was explaining, Your Honor, the facts are very, very similar, almost indistinguishable. You had a replacement compression facility that was authorized under Section 2.55b, just as the express project for GTN had, and there was a certificate expansion which lifted those software controls, but the full costs of the replacement facilities were presumptively rolled into the general system rates as Paul and Dominion commands. So A&R was very, very similar facts, and A&R did not use an in-kind or a like-for-like exception that FERC is pressing in this appeal. So FERC, again, has not even acknowledged that it's departing from its precedent as the FCC Supreme Court case commands. You know, every case is different, so you're arguing that A&R is so identical that that curbs any discretion or it impacts the reasonableness inquiry, that they just were bound, like we might be bound, at a legal precedent to just do the same thing. Is that, in effect, your argument? Yes, Your Honor. The facts are similar enough that if FERC were to not follow the holding in A&R, it would need to offer a reasonable explanation for why it is not doing so, and it would need to offer a reasonable explanation, kind of acknowledging that it was departing from the rule that it set in A&R. I'll note that Paul and Dominion transmission, the language is unequivocal. It says replacement facilities constructed under Section 2.55b of the Commission's regulations qualify for a presumption in favor of the holding of a precedent. What explanation, in your client's view, would have been sufficient, not that you agree with the outcome, but what explanation would have been sufficient for what they did? Any? It's hard to say exactly in the abstract. I mean, certainly if FERC offered an explanation for why it was departing from A&R, the substantive reasonableness of that explanation would be evaluated by this Court. I mean, it just sounds like you disagree with the bottom line. I mean, the argument is, well, they didn't say enough. They didn't explain this. They didn't explain that. So I'm just asking, not in the abstract, but what is it that was missing that from your client's stance, that, well, we disagree with the outcome, but they said more. It just sounds to me, it's not so much you're saying they didn't say enough. You disagree with the outcome, which, which is understandable. It's not necessarily disagreeing with the outcome, Your Honor. It's, again, the fact that FERC did not display awareness that it was changing positions. Certainly, if FERC wanted to change positions, it could offer an explanation for doing so, and that explanation might be reasonable. It might not be reasonable. In this case, under Jupiter Energy v. FERC in this Court, it said FERC must apply reason analysis for any departure from other agency decisions. And there was a departure from A&R here, and FERC's certificate order and the rehearing order did not display any awareness of that departure. And, again, there were two separate lines of precedent that FERC violated in saying that the costs of the replacement compressors would not be rolled into the general system rates. Even setting Section 2.55b aside, in the A&R case that we were discussing, FERC has a well-established rule that when expansion and replacement projects overlap, expansion shippers are responsible only for the portion that would have occurred but for the expansion project. And here, FERC recognized that the three replacement units were the best available to maintain existing service for existing customers. That's at rehearing order paragraphs 13-14, 18-19, 24-25. And those facilities would have been put in place, and this is critical, they would have served only existing customers absent an expansion. So under FERC's case law, that means that the costs for the three compressor units had to be presumptively rolled into the general system rates. And Judge Haynes, to your question in terms of what precedent specifically is FERC violating by departing from that order, that's the transcontinental case, Dominion, a separate A&R case, a separate transcontinental case. Those cases say, and I'll quote, expansion shippers are not allocated costs associated with replacements of facilities simply for using compression facilities. Okay, so I understand that you're concerned about what they did. Let's just ask a hypothetical. If we ended up affirming that, what happens to your company then? What do they do to go forward if they don't get the rolled in? So going forward, there's a rate making proceeding that by settlement agreement is scheduled to occur within two years. At that rate making proceeding, GTN now bears the burden to show that the rates need to be rolled into the general system rate, and that is just and reasonable standard. There's a legal aspect to that and a factual aspect to that. Legally, GTN would in all likelihood have to have an expert witness. Potentially an economist would have to offer legal briefing. And if FERC wanted to change positions on rolled in rates, they could simply, under certain circumstances, find that GTN's expert was not credible or find that there was a legal toss up and GTN did not bear its burden. So if FERC were to lose the rolled in rates issue at the rate making proceeding, there's a settlement agreement which says its loss can be capped at $50 million. So what this court does is it will determine whether or not GTN bears the burden of showing that rolled in rates are just and reasonable at that rate making proceeding, or if shippers do, and that's for the reasons we described in our brief, is very significant and under the settlement agreement could cost GTN up to $50 million. I see that I'm out of time if there are no further questions. All right. Thank you, Mr. Hughes. You've reserved your rebuttal time. Thank you, Your Honor. All right. We'll hear from Ms. Salmi. May it please the court, my name is Megan Salmi, appearing for the states of Washington and Oregon. The consequences of FERC's action here is that Washington and Oregon consumers will have to pay millions of dollars for a project that they didn't need. And going forward, pipelines will follow GTN's lead, abusing a process for routine replacements to create expansion capacity without first submitting to any kind of meaningful administrative review or the ratepayer protections it provides. I'd like to use my time today to discuss two reasons why the court should remand. First, FERC violated this court's precedent when it ignored the undisputed evidence before it about the appropriate cost recovery period and instead just deferred to a general policy that it has never rationally explained or supported. Second, FERC agreed that there was some allocation of costs that may be necessary for the compressor units that may be necessary to prevent subsidization. But in the very same opinion, FERC concluded there was no subsidization and allowed this project to go forward. Rather than address the possibility of subsidization and make a decision on how to allocate those costs in this proceeding, FERC deferred that to a rate case for no rational reason. Both of these issues go to FERC's no subsidy test, which is how FERC makes a threshold decision about whether there's a public necessity that requires the expansion. The no subsidy test, as FERC explains it in its certificate policy, requires projects to stand on their own financially. It ensures that the market is responding to the proper price signals, and FERC explained in its certificate policy that is more important than the mere existence of a contract. At 90 FERC paragraph 61, 392, FERC explained that is more important even if a project is 100% subscribed. Here, the expansion just failed that test, and FERC never rationally considered what the true costs of the project were. On the depreciation expense, I just want to highlight how unusual this case is, because there was no dispute about what the economic life would be. At the time of FERC's decision, GTN was actually submitting testimony to FERC that the economic life of its entire pipeline would end by 2050, which is exactly what the states were arguing in the certificate proceeding. Yet, FERC didn't consider any of this, did not consider how that would, allowing more costs to be put onto GTN's system would substantially increase the risk for future gas consumers. Instead, FERC just cited a general practice from prior cases that it would use the past depreciation rate from the prior rate case. What's indicated that they didn't consider it, as opposed to not finding it persuasive or controlling, and cite that the policy, again, is yours, that there's a failure of explication of all the details of the reason that ergo means they did consider it? Yes, Your Honor, they explicitly did not consider it, and that's at paragraph 40 and 41 of the hearing order, where they refused to consider that evidence and said we are just going to rely on our prior policy. And the only explanation they provided for that policy was a cite and a footnote to the Tennessee gas case, where it said the policy exists to avoid undue delay. But FERC never explained, never cited evidence about what delay would happen, especially when the evidence here was undisputed and FERC was reviewing it anyway. But what's the best case that that argument you're making now is reversible error? I would say to the courts, this court's precedent in Florida Gas and Shell Oil, where this court has held that FERC must support its policies that are adopted in case-by-case adjudication with evidence, they have to consider alternatives, and they have to explain why they will make some exceptions to the policy and not others, and rationally explain why its policy is the best case forward. And that explanation has to hold up in every case where it is applied, and it is not here. Does it matter that Idaho isn't here? No, Your Honor, because this case is not about, uh, this case is not about Idaho needs, it is about whether the project meets a threshold test of subsidy, and FERC could have considered whether the project, I'm sorry, I'm going to back up a second, if a pipeline or some of its customers want to expand, they need to pay for it. And here, it is not just Idaho that is paying for the project, it is all of the consumers of the pipeline who will pay for it, because the compressor costs are not included, and because there are substantial costs of the pipeline that are being deferred until after those contracts expire. Unless the court has further questions on depreciation, I'd like to move to the allocation of compressor costs. Um, here, FERC acknowledged that there was new capacity that was being created that was not needed by the existing captive consumers of the pipeline, and that will solely benefit the expansion, and that this could mean existing customers will be subsidizing the project. That's not an issue that FERC could just defer to the rate case, because, again, it goes to the threshold question of whether the true costs of the project are being considered when FERC approves the certificate. The rate case is not where FERC will decide the public necessity, it is in this case. And here, FERC just gave two explanations. A, that it was impracticable, but it's not impracticable, impracticable because this is a simple calculation that FERC routinely does, and it's central to the FERC's no-subsidy test. And second, there's no risk of double recovery here. FERC acknowledged in paragraph 36 and 51 of its hearing order that whatever rates it sets will not affect, A, what the project's customers will pay, or B, what happens in the existing customers' rates, because that's being decided in a separate case. And in that case, GTN was seeking to increase the rates of existing customers to pay for this expansion in compressors. What's the bottom line relief you want on behalf of your clients? You just want to do over, back to FERC, or remand, limit it, narrow it to the scope of what your clients are asking what? We think the court should vacate because FERC fundamentally got it wrong here and they need to redo their decision, or at minimum, the court should remand with instructions to consider the evidence about what an appropriate cost recovery period should be and to make a decision on how they're going to allocate the cost of the compressor units. Just to conclude, on depreciation, FERC needs to rationally support the policies it applies in individual cases. And on the compressors, the Gas Act and Certificate Policy require FERC to resolve the subsidy question before a rate case. Thank you. All right. Thank you, ma'am. You're reserved here. Rebuttal time. All right. We'll hear from Columbia Riverkeeper. Good morning. May it please the Court. My name is Jan Hasselman on behalf of Columbia Riverkeeper and Rogue Climate. I'm going to focus on the National Environmental Policy Act issues in this case. We've raised three different ways in which FERC violated NEPA. And as we explained in our letter brief on Friday, we don't think the Supreme Court's decision on Thursday in seven-county infrastructure impacts any of those claims. And of course, we're prepared to discuss that further. With time short, I'll jump right in. It may not impact claims, but you don't disagree with that the court, you know, goes across the board in terms of substantial deference that, you know, is owed in these cases. Obviously, the issue is different, but you minimize that or because the facts are different. I don't want to squeeze your time on this issue. Just, you can. I think that's right, Your Honor. As you recognize, the issue is different. It was a reminder. The court was pretty clear about it was reminding some courts that they had run astray of the preferential, arbitrary, and capricious standard of review. I don't read this court's precedence as being confused by the standard, and I think our case fits very squarely within that standard. So let me turn to the first one, the no-action alternative. This is a requirement that's imposed by statute, as well as NEPA regulations. It's a very important element of the environmental impact statement because it provides a comparison between the impacts with and without the project. And it informs the agency's substantive decision. Now, this EIS does not include a no-action alternative. The reason that it does not by its terms is that one would not meet the purpose and need for the project. And that's just not a lawful basis on which to fail to include this alternative, and if accepted, it would eviscerate what's a clear statutory requirement. Respondents seek to distance themselves from their own statement, but it is what the EIS and the rehearing order state. Now, they try to rewrite history by saying that we can sort of glean the no-action alternative by implication, but that doesn't work either. This court, in the Brazoria County case, said that the no-action alternative is not simply the absence of effects. It looks at what happens in the real world if this project doesn't go through. For example, the pipelines, customers could get gas through other pipelines. So again, FERC's own regulations provide specific direction on what this is supposed to look like. The same is true of their guidance and of NEPA guidance. And EPA, which is statutory authority over EISs, was very specific about what it said should be included in the no-action alternative twice. So FERC could have drawn from all this to reasonably assess a no-action alternative. And what seven-county infrastructure says, okay, if they make some reasonable inferences about what the future might look like, then that's something that this court's not going to get in the way of. That's what the Brazoria County was. But they didn't do it at all, and that's a statutory question. So let me turn to the next issue, which is the segmentation of the project into components. And again, NEPA's regulations prohibit segmenting a single project into components. Courts, there's a two-part test. Courts ask whether the components are functionally interdependent of each other and second, how close they were in time. Here, the interdependence is obvious. The express project could not exist without the compressor replacements. In fact, the primary element of the express project was removing the software controls that limited the capacity of the just brand-new, recently installed compressors. And as to the timeframe, the facts speak for themselves. The company announced them as a single project. It entered into contracts for the increased capacity from both before proceeding with either. And the construction on the compressor replacements was just wrapping up when GTN applied for its certificate for the remainder of the project. FERC's position here is that there's no connecting action issue because the compressor replacements are not subject to NEPA, but that isn't how connected action claims work. It happens all the time that some components of an overall action are not subject to NEPA. That's this Court's precedent in Save Barton Creek Association, where this Court applied a segmentation analysis to non-federal highways that weren't subject to NEPA. There's more examples in our reply brief at page 14. If these two phases of a project are not connected actions, it's hard to imagine what would be. So finally, let me argue overarchingly that FERC doesn't know, recognize, or otherwise appreciate the connected actions claims. I'm not arguing anything overarchingly, Your Honor. I'm applying, seeking to apply the arbitrary and capricious standard. Here, everybody saw from the beginning what was . . . I mean, you're saying, obviously, in this case, you're saying they didn't, right? You're saying what they did was arbitrary and capricious, right? Right. I'm assuming you would spot that as an agency, they were aware of the connected action claims, whatever that landscape is. But in this instance, you're saying their actions were arbitrary and capricious by not following the typical doctrine, right? That's correct. This issue was . . . So what's the animating factor for that? I mean, it's one thing just to say, okay, they were arbitrary and capricious. Got it. Because you get a result that it doesn't like. So I'm just trying to hone in, you know, in your argument. I understand what you're arguing. I'm not going to cheat you. I'm going to give you a chance to respond. So I think you're asking, you know, what did they miss? Yeah. I'm saying, okay, we got to spot as an agency. I mean, you're making the argument about segmentation of claims, connected acting of claims, you know, with an agency that does this every day. I mean, this is their business, but you're making an argument that, like, you know, they didn't get it. They didn't understand the claims were segmented. They didn't understand what the precedent was, yadda, yadda, yadda, yadda. I mean, I'm oversimplifying. But making this, but your burden and others' is to say what they did here is arbitrary and capricious. So it can't be, well, they don't understand the landscape, but you're saying in this case, they deviated from the prescribed analysis, right? And so I'm just trying to hone in on beyond just saying it, what is it in the record or otherwise animates that deviation? You know, I can't tell you what the reason that they departed from what is pretty clear direction. I can say that everybody saw what was going on from the beginning with the compressor and the EIS. Now, if the entire project had been in the EIS, it would have looked different. There would be significantly broader assessment of the impacts, for example. The fact that the compressors were already in place when they did the EIS meant that the EIS didn't look at the noise and the pollution and the other consequences of putting them in place. And it missed the opportunity to look at alternatives that wouldn't have involved those compressors. But by segmenting them out of the analysis, they left it behind. I'm going to give counsel two minutes. I kind of gobbled up his time and cheated him out of him completing his thoughts. So you got two on the house, counsel. Thank you, Your Honor. Was that what you were looking for? Yeah. No, I wasn't looking for a specific answer, but you were responsive to my question. I appreciate it. So let me turn to the safety issue. That's the third of our three issues. Now, safety was a key issue during the public process. And so if we affirmed, how would the safety be hurt? How would safety be hurt? So they missed a key issue in the EIS. The purpose of the EIS is to inform the decision. You have a 60-year-old pipeline crossing heavily populated and fire-prone areas run by a company with a history of violations. What was missed was a decision that disclosed and was transparent about that fact. Now, in this case, there is a clear statutory requirement. FERC is obligated under NEPA to consult with and obtain the comments of agencies with expertise. That's at 42 U.S.C. 4332 2C5. FERC didn't comply with that statute. Like, there's no dispute about it. There was no request for comments. There were no comments. There was no give and take with the DOT that regulates pipelines. That should be the end of the discussion. There was also a rich record about specific safety concerns. The Environmental Protection Agency, again, told FERC what a proper safety analysis should look like. Not a single feature of that appears in the EIS. And other entities with expertise like the Pipeline Safety Trust and the governors of the states raised specific concerns about this project in this place. Those concerns were all dismissed without explanation. So, you know, to answer your question, Your Honor, the EIS missed this key issue. The public didn't, you know, get an opportunity to have their concerns addressed. And the decision was made without being fully informed about the impacts of the project on safety. All right. Thank you, sir. Thank you. You have reserved your rebuttal time. All right. We'll hear from FERC.  Council collectively says FERC was asleep at the switch. You didn't read your own rules. You didn't understand the Fifth Circuit precedents. If you did, you ignored them. And, you know, you definitely didn't read the statute. It says what it says. You didn't have to be textual or reasonless. You didn't do it despite your tenure, whatever. So I'm being slightly facetious, but that is kind of the full force deal here. So explain to us how they are not correct. Yes, Your Honor. First, though, before we dive into the technical nitty-gritty of this case, I want to take a step back and explain why we're here today, which is that the commission found this project was needed to bring in lower-cost gas from western Canada to supplement rapidly declining gas production in the Rockies region. Three unaffiliated shippers subscribed to 100% of this project's capacity for multiple decades in binding precedent agreements. The project would help these shippers to meet peak-day demands for natural gas from residential, commercial, and industrial end-users in the northwest region. It would increase reliability, enhance supply diversity, mitigate constraints on other transportation routes, and provide consumers with access to Canadian gas that has historically been lower-priced. And as Judge Haynes noted earlier, Idaho has a significant part in this case. The majority of this project is specifically designed to serve Idaho, who has submitted multiple filings to the commission explaining that this project was urgently needed to meet rising demand. Now, turning to the state's challenges, I want to first clarify what the commission's no-subsidy policy actually requires, because I think there's some confusion here. This policy does not require the commission to deny certification if a pipeline can't mitigate all the financial risk associated with its project. The commission does not need to reject a project that might be unprofitable. It just requires that if this project is unprofitable and the project results in a loss, that loss cannot be passed down to existing shippers. And that's exactly what the commission guaranteed in these orders. There's no subsidization by existing customers in either this Section 7 proceeding or in a future General 4 or General 5 rate proceeding. I want to first explain that the initial rates being set in a Section 7, they're just temporary placeholders until we can figure out a just and reasonable rate under the more extensive procedures of Section 4 or 5, where there'll be a full investigation into the factual disputes and the commission can hold an evidentiary hearing with the opportunity for all parties to submit their evidence and witness testimony. The purpose of having the temporary Section 7 rates is that when the commission finds a new pipeline project is needed in the public interest, it can get those facilities up and running as quickly as possible and not slow things down by getting mired and pogged down into factual disputes about how costs should be allocated. So under Section 7, therefore, these initial rates, they don't have to be just and reasonable. They merely have to hold the line until the next Section 4 or 5 rate proceeding. And this approach has been consistently upheld by the Supreme Court and multiple circuit courts. Now, the initial rates under Section 7, they're narrow in scope. They're for an interim basis, and they apply only to the expansion shippers. Critically, a Section 7 proceeding cannot change the rates that existing shippers are paying. That can only be done in a Section 4 or Section 5 rate proceeding. So existing shippers, the rates that they're paying are those that they had already agreed to under the prior black box settlement, and that's the rate that they will continue to pay until the next general Section 4 or Section 5 rate proceeding. This Section 7 proceeding is not going to change their rates. And by denying a predetermination of rolled-in rates, the Commission likewise assured that in any future Section 4 or 5 proceeding, existing shippers would also be protected. What would cause the biggest problem of us remanding based on what's been objected by the other side? I'm sorry, would you mind repeating the question? My question is, I'm trying to understand the outcome of our decisions, okay? I've asked about if we affirm. Now I'm asking you if we remanded based on what they're objecting to, what would be the worst result in your view? Because you're saying, we did this, we did this, we did this. Okay, so what would be the problem? On remand, assuming there's no, that the order is not vacated, the Commission would have to reassess the record before it and depending on the grounds of that remand, reconsider the issues that the court found were insufficiently addressed the first time around. But, you know, it causes... But how would it hurt? It would hurt the shippers and their customers who currently rely on the incremental capacity created by this pipeline to fulfill their peak day demands. The evidence had demonstrated that without this project's additional capacity, Cascade would have supply shortfalls on peak days as soon as October 2024. And so this project is urgently needed for end users in the Pacific Northwest in their natural gas demands. And by remanding the Commission's decision, it draws into question whether this project that they've needed will be available in the future. And turning back to the no subsidization, so when the Commission sets initial rates under Section 7, it holds the line. And that usually results in maintaining the status quo and the existing rates that were already in place prior to this Section 7 project. And that's in the public interest because it merely tells the new shippers, please pay the same rates that the other shippers on this pipeline are already paying. There's no subsidization from that outcome. If it turns out that the additional rates that the pipeline set were too low or it under-recovers using these rates, it's not allowed to pass that loss onto existing customer. It merely means that the pipeline takes a loss based on those initial rates. I also want to talk about the proper price signals that the State's Council mentioned. The Commission's orders did send proper price signals. By denying a predetermination of rolled-in rates, the Commission signals to the pipeline, you know, we can approve your project, but you should know that there's a chance that you will not be able to roll in the project costs into your existing rates. And so should you decide to accept the certificate, you have to account for that in your business decisions. That's the proper price signal that the Commission is sending through its denial of predetermination and through its orders. If a pipeline wants to proceed with this project, it has to know that it cannot subsidize these costs using existing shippers, and it has to be able to absorb those losses on its own. I also want to address Judge Stewart's point concerning the evidence regarding the depreciation rates. As I mentioned, the Commission did consider this evidence. In the rehearing order, it explains at paragraph 78, even though the evidence was untimely and jurisdictionally barred, it nonetheless, on the merits, found that after considering it, it didn't compel a different result. And in paragraphs 79 through 84 of that rehearing order, and also in the second rehearing order, where the states filed yet another untimely evidence, yet more untimely evidence, the Commission determined that ultimately this evidence was too speculative. It was currently being contested in the ongoing rate proceeding, and simply just did not change its determination as to certificating the project. Turning to GTN's arguments on the predetermination of rolled-in rates, the 2020 ANR pipeline case does not support the argument that the 2.55B costs must be completely allocated to the existing customers. In the ANR pipeline case, there was both a 2.55B replacement and an expansion. The existing compressor had 12,000 horsepower, and it was replaced with a larger-sized compressor that the pipeline used software controls, as in here, to operate at the certificated level. And in the subcenter expansion, where those controls were removed and there were replacements, the pipeline allocated the project costs proportionately between existing shippers and expansion shippers. What I understood is his argument. Yes, like every case, the facts would be nuanced slightly differently, but he says, if I understood him right, notwithstanding whatever flight deviations, it's a compressor case, it's spot-on, and that you, FERC, has an overarching duty to follow its own precedents. And I understood his response to my question is that you didn't do that. Even putting aside whatever discretion, once you, FERC, lays it out, da-da-da-da, it's similar enough, notwithstanding some nuance facts, that that should have been the application in this case, and it wasn't. And to wit, that alone, he says, is, you know, abuse of discretion, et cetera, et cetera. And I'm not putting words in his mouth, but I thought that's the way I understood it. But he says ANR is spot-on. So in ANR, the pipeline did allocate costs between expansion shippers and the existing shippers. It did not do what GTN is proposing here, which is to allocate the entirety of the 2.5 IB costs to the existing shippers. It allocated costs to the existing shippers by estimating the cost of a replacement compressor that was sized to have like functionality. So it estimated the hypothetical cost of an in-kind replacement and then allocated that portion to existing shippers. The rest of those costs were allocated to expansion shippers, and that's precisely what FERC is allowing for here by denying a pre-deformation of rolled-in rates. This means that in the future, Section 4 or 5 proceeding, the customers will be able to argue that a portion of these 2.5 IB costs should be appropriately allocated to expansion shippers because it is being used for only their benefit. And that brings me to another point that GTN Council mentioned, which is why it is appropriate to allocate these costs even though the compressors themselves were necessary to maintain existing service. And that's due to changed circumstances. When the compressors were first installed, the existing shippers, they were the only shippers on the system, and this was the closest off-the-shelf available size that would still maintain the existing level of service on the coldest winter temperatures and maintain the same output that the prior compressors had done. And that's a requirement under 2.5 IB. The replacement cannot diminish or reduce the level of service. What GTN had done was a study comparing the Solar Titan model and the Solar Mars model, which is the smaller model that the states preferred... would have preferred to be used. And the smaller Solar Mars model was incapable of producing the same output as the prior compressors on the coldest winter days, and that's incredibly important for system reliability. Pipelines, they design their system based on peak day demand on the coldest days in the winter where demand for natural gas is the highest. Therefore, to use a model that was insufficient to meet that demand could have led to system failure. Now, that is all true at the time that the compressors were replaced under 2.5 IB, but under a Section 4 or 5 proceeding, where there are changed circumstances that would render the existing rate no longer just and reasonable, then costs can be reallocated so that the rate is just and reasonable. And so here, once the expansion had been certificated and now the software controls that were previously limiting the horsepower to the previously certificated level were removed, then for the first time there was this additional capacity that had never before been available that is now going to be used entirely to serve the expansion shippers. They will be benefiting alone from this additional capacity. Therefore, it's necessary in that future Section 4 or 5 rate proceeding to determine whether a portion of these costs should be allocated to the expansion shippers. On the NEPA challenges, as Judge Stewart recognized, the Commission drew a reasonable line and that line is supported by its regulations and long-standing agency policy that 2.5 IB replacements will not have significant environmental impacts. They're limited to the same right-of-way, the same site, can't disturb any new ground, and they must be operated at the existing levels of the prior facilities. Therefore, the line that the Commission drew supports the regulatory purpose of 2.5 IB, which is to avoid triggering an unnecessary level of review for projects that will not have significant environmental impacts. And in any event, as the Commission recognized in its rehearing order, it did produce a comprehensive EIS of the overall project's impacts. So in the environmental analysis, the Commission looks at the entire system after expansion, and that includes both the baseline environmental impacts from the 2.5 IB replacements in addition to the additional environmental impacts that occur once the software controls release excess capacity. And therefore, the study that the Commission did on the environmental impacts looked both at the baseline environmental impacts plus the impacts from adding 150,000 decathrones per day of capacity to the project. On safety issues, as Judge Haynes asked, what is the consequence of these alleged safety deficiencies of which Riverkeeper has not demonstrated? I mean, the answer is there are none. The Commission fully considered the comments submitted, but just simply disagreed with their probative value. That doesn't warrant finding that the Commission's orders have to be remanded on environmental grounds. And finally, I'd like to also clarify that in terms of whether the 2.5 IB costs were already in the existing rates, the Commission did not make a definitive determination as to whether those costs were in the rates. It said in the orders that they appeared to be in the rates, and that's because this was hotly factually disputed by GTN and the states and Riverkeeper. GTN submitted filings saying that they were in the existing rates, and the states and Riverkeeper said that these were not. But because these rates came from a black box settlement, the Commission couldn't determine for itself whether the 2.5 IB costs were actually in those existing rates. But regardless, under either circumstance, there is no subsidization either way. If these costs were already in the rates as they appeared to be to the Commission, then that's what the existing shippers agreed was just and reasonable to pay in the black box settlement. And regardless, the Commission can't change those rates into the next general rate proceeding. If they were not yet in the existing rates, then there's also no subsidization by existing shippers because they haven't started paying for any portion of the 2.5 IB compressors yet, and they will not unless GTN can first demonstrate to the Commission in a future Section 4 or Section 5 rate proceeding that there would be no subsidization from rolling in these costs. The joint intervenors raised some threshold issues about ripeness and standing. Let's see what's in your brief. Do you want to comment on any of that? The Commission did not take a position on ripeness and standing. My personal understanding is that denying the pre-termination of rolled-in rates, it's a burden-shifting issue. If the Court finds that the shifting of the evidentiary burden is sufficient to warrant harm, then it would appear that standing requirements for a concrete injury could be satisfied. But if, on the other hand, this Court finds that the mere shifting of an evidentiary burden does not result in concrete harm, then the standing is much less clear. Lastly, I want to touch on the depreciation rates issue that states raised. The general policy that's undisputed is that when the Commission establishes initial rates for an integrated expansion like the project, it uses the pipeline's most recent Commission-approved depreciation rate from their last Section 4 or Section 5 rate proceeding. Here, that policy makes sense because this is the most recent instance in which the Commission has had an opportunity to fully examine in an evidentiary hearing what an appropriate depreciation rate for the system would be. This contrary approach that the states advocate for to limit the depreciation rate based on the length of the precedent agreement, that is an exception that is reserved for delivery ladles that serve a single customer. It makes sense in those cases because that project only serves a single customer, and once the term of the service contract for that customer is over, then there's no more use for these project facilities. These delivery ladles, they usually connect directly to the customer's storage facilities or some other facility specific for that customer. Here, evidence demonstrated that once the initial term of the precedent agreements were over in 33 years, GTN could either negotiate to extend or renew those precedent agreements, or it could re-market that capacity to other shippers, and there was ample evidence that they could successfully do so. In the binding open season, it had received overwhelming market response for the project, and none of its existing shippers had offered to give up any of their existing capacity to make room for new shippers on the pipeline. I see that my time is up, and so unless the Court has further questions, I'll rest. All right, thank you. Let's see, I believe GTN, Mr. Murata. May it please the Court, Sean Murata on behalf of GTN in our role as intervener in support of the Commission. I'll pick up where Ms. Gao left off, which is with the depreciation issue that my friend from the State rises. My friend argues that the Commission needs to justify its policy, but it has justified its policy. It goes all the way back to Atlantic Refining from the U.S. Supreme Court that made clear that asking FERC to engage in complicated and detailed rate-making in the context of a Section 7 proceeding doesn't make a lot of sense, because it's a different standard and because it would take a great deal of time and effort. A rate-making proceeding is a trial-like proceeding that's held in front of an administrative law judge with technical experts and economists and all the data that goes into it and is then reviewed by the Commission. So what Atlantic Refining does is it develops the phrase, hold the line, have a placeholder initial rate that will hold the line and be in the public convenience and necessity until we reach that next rate case. That's the general policy, and it's fully justified by U.S. Supreme Court precedent. I take the States to say, well, but in this case, it wouldn't be that hard to engage in the rate-making. But that's why you rely on general policies. The point of general policies is you don't say, in every single case that comes along, well, this is easier than the average case, so we're not going to use the policy. You rely on the policy. But second, as I think all of the discussion that we've been having here today shows, it's not actually that easy. To be clear, we think we are entitled to a presumption of rolled-in rates under long-standing Commission policy. But all the Commission held was is we are going to defer this to the next rate case. A lot of the information that the States rely on to say this is easy, that we know what an appropriate rate depreciation amount would be, comes from the separate rate case that FERC explained in detail why that is jurisdictionally barred. If you want that evidence to come to the Commission's attention, you have to raise it in a timely rehearing request that comes straight from the Natural Gas Act. The States admit they didn't do that. They just say, well, it should be excused or something else. But it's a jurisdictional bar that this Court is required to enforce. Second, with respect to allocation, the States seem to suggest there's some sort of tension that FERC said that there has to be some allocation of some of the cost to the expansion shipper, but they refuse to do it. As Ms. Gow pointed out, that's not what FERC said. What FERC said is we're not going to presume anything, and it's all going to be pushed off to the next rate case. So the idea that there is some baseline cost that has to be shifted is simply wrong. In fact, our position at the next rate case would be all of it should be rolled into the system rate. We think we're entitled to presumption as well, but it doesn't mean there's going to be some portion shifted to us. Third, and this gets to the environmental aspect of the case, Seven County really, I think, makes this Court's task even easier than it was before, because what Riverkeeper is arguing is they didn't say enough. They should have said more. They should have looked at more stuff, talked to more people, gotten more comments, and written more stuff in an already hundreds of pages EIS. But what Seven County says is that way of looking at EISs is not the way you do it anymore. You don't look at it and say, why, you know, it's 300 pages. Why isn't it 400 pages? Why isn't it 500 pages? You can always think of something more that FERC could have done to run something down further, but what the Supreme Court said is that a lack of pages does not a lack of detail. FERC looked at all of the things that they were asked to look at. They just didn't do it as in-depth as Riverkeeper would like. Take, for instance, the no-action alternative. FERC recognized that the no-action alternative means that the environmental impacts of the project won't happen. That's pretty detailed. It's the baseline. And also what I haven't heard today is this Court's case law and the D.C. Circuit's case law on Brazorian County and Citizens Action Coalition from the D.C. Circuit that says, look, you take the project as you find it. It's a no-action alternative that meets the project's goals. The project's goals are to add capacity. If you don't add capacity, you're not going to meet the goals, so we don't need to consider it more detailed than that. With respect to the connected action analysis, I think it's important to keep in mind that even if you found this was a connected action and it's not for all the reasons discussed in the briefs, all you would do is need the analysis of building the compressors. But these are replacement compressors. They are built in the same work area. They are built in the same temporary space. They are essentially taking out one compressor, putting in another. There's really nothing more that are environmental impacts that come from that because you're swapping out. So remanding simply for FERC to say, yes, they are going to take a replacement compressor and drop it on the same footprint, it doesn't add anything to the analysis, which, again, is what 7 County is all about. And then finally, with respect to safety, FERC discussed safety risks at page 130... sorry, record entry 135, page 89. It said the biggest risk is going to be a fire or explosion. We understand that our friends at PHMSA, the Pipeline Hazardous Materials Safety Administration, have detailed standards that govern these things, and we trust them. And moreover, the information that you've presented us about two incidents in a completely different part of the country where we don't even know what the root causes are yet doesn't add anything to our understanding. Again, under 7 counties, that's detailed and that's sufficient. They could have written more pages, but they didn't have to, unless the court has questions. All right, thank you. All right, back at the top, I believe. Mr. Higgins, you have a rebuttal? All right. I know Ms. Salome, sorry, at the bottom, you've got segmented argument, and then you've got your rebuttal. May it please the Court, I'm here, again, representing the states of Washington and Oregon, in opposition to GTN's petition and in support of FERC's denial of the predetermination of rolled-in rates. I just want to make three points in response to GTN's argument. First, this case, as FERC also argued, is not at all like ANR. GTN did not present its replacement and expansion in the same proceeding and therefore did not present information about how this was going to affect existing captive consumers in the expansion case. And that's actually what makes this case unprecedented, because unlike all of those other cases involving replacements and expansion, since the certificate policy was decided here, GTN did its replacement and then sought to use capacity created by those replacements in order to expand. And that's why this case is both unprecedented and sets a very dangerous precedent, because it would allow pipelines to abuse replacement process to subsidize expansions, and that was exactly the... What's the thrust of the danger part you're putting in here? I mean, is that just hyperbole? I mean, dangerous precedent. So, I mean, what does that mean? Well, I would refer to the Court to Order 603 in which FERC acknowledged that there were going to be limits on the replacement process to prevent the exact same thing that was happening here. And FERC has to be able to view the whole project in one proceeding and the impacts that it's going to have on all different classes of customers. And allowing it to proceed without any kind of administrative review is why I would say this sets a dangerous precedent. Dangerous is an interesting word. I'm not going to belabor the point, but it's not going to change its orbit. I understand the issues are important, but to me that may be going a little bit far. But you got to end strong, I suppose. I'm just trying to make this administrative law case a little more exciting for you. Oh, now I get to it. Okay, all right. That's a task. That's a hurdle. I'm doing the best I can. Thank you. Oh, you're doing good. But now you have another two. Do you want to do yours while you're up, or do you want to come back? We're good. You have another two minutes, I think. I would like to reserve my rebuttal time to address our case on the merits. That's fine. Okay. We're easy, you know. We'll call you back up. You want to wait to do it? What he's saying is you're up here, so why don't you just do your rebuttal now? Oh, sure. Happy to do that. I'm sorry.  Okay. First, deferring this issue of cost allocation to the rate case is just not a reasonable explanation here. Unless and until FERC reallocates those costs, existing captive consumers will bear those costs and also the risk of recovering those costs. And the risk is currently on existing customers until FERC makes that decision. And that is also what the subsidy test intends to prevent. And the Supreme Court in Atlantic refining did say the initial rates hold the line, but what the court actually did in that case was require FERC to responsibly react and scrutinize initial price proposals. And the reason why the court required that is because FERC cannot go back and change the initial rates in a later rate case. And I would point the court to the D.C. Circuit's decision in Missouri Public Service Commission, and that's where the D.C. Circuit said if you are going to defer an issue, you need to provide at least a reasoned explanation why you're going to do so. And the reasons FERC gave that it was impractical or there was a risk of double recovery just don't apply here. In addition, this did violate 2.55b. This was not the closest off-the-shelf size. This was a larger size that GTN alleges was needed for engineering reasons, which we also disputed. And as FERC concedes, this created new capacity. And FERC's regulation, 18 CFR 157.202, clearly states compressor replacements that create an incidental increase in capacity do not qualify under 2.55. Finally, on the depreciation expense, FERC did not weigh this evidence or consider it in determining the depreciation rate. And all of the evidence about post-2050 demand pointed in one direction, and that was that it would not be necessary, unless the court has questions. I will conclude. All right. Thank you. Thank you. Now, back up to the top. Yes, sir. Yes, thank you, Your Honor. If I may, I'd like to make four points in rebuttal. The first is to respond to FERC's counsel's comment that in A&R there was an allocation between existing and expansion shippers, which the suggestion was there was no allocation in the express project here. But in the express project, there was $75 million in expansion costs that GTN wanted to allocate to the expansion shippers. There were $251 million in fixed replacement costs that GTN and FERC's longstanding precedent would have rolled into the general system rates, which means that the expansion and existing shippers pay for those on the same footing and for the same rates. The second point I wanted to respond to was from the State's counsel regarding the separate proceedings, that there was replacement proceedings, facilities installed in 2021, and then the certificate proceeding in 2023. That only highlights that these were separate proceedings, that the facilities that were replaced actually were serving the existing customers, and it was therefore proper to roll those rates into the general system rates, which I think kind of relates a little bit to Judge Stewart, your comment about the arbitrary and capricious standard and whether or not that requires a gaping hole in FERC's reasoning, but there was a gaping hole in FERC's record on GTN's narrow point about Section 2.55b, replacement facilities. When facilities are authorized under that section, they must be rolled into the general system rate, and GTN made that point in its rehearing petition, and the rehearing order did not respond to that argument at all. There is nothing about FERC's specific policy on Section 2.55b, replacement facilities. At rehearing order 31, FERC simply responds to that argument with its general policy of allocating costs between expansion and existing shippers. FERC did not acknowledge that policy, and for that reason, and others in our briefs, we ask this Court to remand on the very narrow issue of the predetermination of rolling rates, if there are no further questions. All right. Thank you, sir. Thank you. All right. The anchor man. The last word. I want to make two brief points on rebuttal. Mr. Murata characterized our case as looking for more explanation, more pages, more words in the EIS. That's probably a mischaracterization of our case. With respect to the no-action alternative, what they said, and what they repeated up here, was that you don't need to look at a no-action alternative when it doesn't meet the purpose and need of the project. If that's the case, there will never be a no-action alternative in an EIS. There will never be a no-action alternative that meets the need and purpose of a project, so we're eviscerating a statutory requirement with respect to safety. Not one person mentioned the statutory requirement to consult with the DOT. And, again, there's a lack of connecting the dots between the specific safety concerns documented in the record of this pipeline in this place, instead of just an open-ended deferral to the regulations. And, finally, with respect to connected actions, I mean, this is, by their words, phase one and phase two of a single project. If those aren't connected, then nothing is. Judge Haynes, you asked a number of questions about remedy, and I want to... I think it comes in two flavors. A remand on its own is valuable, just to get the environmental analysis right and to address some of the problems that we've highlighted. And I note that neither respondent noted any problems that would arise. The reason that vacatur of the decision is an important part of the remedy is that the purpose here is to make a new decision that's informed by all of these facts, like, for example, the safety effects. They have to make a new decision that's accountable, that addresses those things, and have an opportunity to add any mitigation or additional conditions. But you're making an argument of a do-over. You know, you're making an argument of a do-over, you know, in a vacatur, not just saying, well, they not only have to do their work, but they have to show their work. And you say that's, you know, not necessarily what it's saying. But a vacatur is colossal in terms of what you're asking, because if it's a remand, they say, well, okay, that's not justified here, but a remand just says take another look at what you already did. So they show their work more explicitly, et cetera, et cetera, but they end up where they were. You know, vacatur says, no, wherever you ended up is the wrong deal. And so you say, well, that's palpably called for, you know, in this case. That's a big hill to climb, and I'm not saying whether you made it up the hill or not, but that's a tall order based on the record. It's a lot here. We haven't read it all, but, you know, we're going to plow through it. There's a whole lot of pages here. It's in the record, et cetera. You do have SCOTUS's ruling of recent. He says, well, that was only for the D.C. Circuit. The rest of you all can ignore it. You don't have to. They've been, you know, they've deviated from the ranch, and so the Fifth Circuit hadn't, so just skip over that. I'm being facetious. But I'm just saying it does say what it says, and it just sounds some ways in your argument. You are wanting us to reach deep into the manner in which Perk did it, we get it, and like the outcome, but I mean it's a reach when on the vacatur part, there are things they ask, you know, about remand. Anyway, that's just the appreciation of the case in my way of saying we got all the arguments. We asked you for supplemental briefs, and it's in there. We read all the pages, and it still doesn't become scintillating, but we read it anyway. We appreciate the great advocacy on the case, and we do take it seriously, all the arguments that were made, including the threshold kind of argument. We'll sift through it and give it our best shot. Hopefully, we will show our work adequately. Whoever doesn't agree with it will at least know what we said and why we said it. Anyway, with that, thank you, Counsel. We appreciate it. Thank you, Your Honor. The case will be submitted. All right.